In re PARR MEADOWS RACING ASSOCIATION, INC., Debtor.

In re Ronald J. PARR, Bankrupt.

LINCOLN SAVINGS BANK, FSB, American Home Insurance Company, National Union Fire Insurance Co. of Pittsburgh, Pa., New Hampshire Insurance Company and T. Frederick Jackson, Inc., Plaintiffs–Appellees,

v.

SUFFOLK COUNTY TREASURER, Defendant–Appellant.

No. 894, Docket 88–5045.

United States Court of Appeals, Second Circuit.

Argued March 9, 1989.

Decided July 24, 1989.

Dennis E. Milton, Chief Deputy County
Atty. for the County of Suffolk (E. Thomas
Boyle, Suffolk County Atty., Brian B. Mul-

**1542**

holland, Asst. County Atty., of counsel), for appellant County of Suffolk.

Harold P. Weinberger, New York City (Linda C. Goldstein, Kramer, Levin, Nessen, Kamin & Frankel, of counsel), for appellee Lincoln Savings Bank.

Before VAN GRAAFEILAND, CARDAMONE, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

On this bankruptcy appeal we must balance two important competing interests: a creditor's interest in recovering as much of its claim as possible from a bankrupt debtor, and a local government's interest in obtaining payment of its property taxes. The County of Suffolk, New York ("the county") appeals from a judgment of the United States District Court for the Eastern District of New York, Leonard D. Wexler, *Judge*, 92 B.R. 30, affirming an order of the United States Bankruptcy Court for the Eastern District of New York, Robert J. Hall, *Judge*, holding that the automatic stay, 11 U.S.C. § 362(a)(4), bars the creation of postpetition liens for unpaid real property taxes, and denying postpetition penalties and interest on the underlying tax claims. We hold (1) that the automatic stay prohibits the creation of a local tax lien upon real property unless the county has a prepetition interest in the real property; (2) that the county obtains an interest in the real property as of the "tax status date"; (3) that the county is entitled to a priority for postpetition interest on valid tax liens; and (4) that the county is not entitled to a priority for penalty fees on any tax claims. Accordingly, we affirm in part, reverse in part, and remand.

## BACKGROUND

A. *Real Property Taxes in Suffolk County.*

Preliminarily, we should note that under the systems for taxing real property in Suffolk County, assessed values are made and reviewed by assessors in each of the ten towns, and taxes are levied by multiple tax districts. But all procedures for the collection of delinquent taxes are carried out by the county itself. It is for this reason that these proceedings are brought by the county, rather than by the towns or school districts. For convenience we have sometimes used the term "county" to include these other districts.

Taxation of real property in the county is governed by New York law, *see* N.Y. Real Prop. Tax Law § 100 *et seq.*, and by the Suffolk County Tax Act (the "tax act"). Specific provisions require that town assessors assess all real property located in their respective towns according to its condition and ownership "as of" the tax status date for each year—June 1 in Suffolk County; N.Y. Real Prop. Tax Law § 302; Suffolk County Tax Act § 5; that they prepare thereafter an official assessment roll, listing all taxable property in the county, Suffolk County Tax Act § 6; that, on the third Tuesday of July, the assessors hold a hearing after public notice to consider complaints and proposed modifications to the assessment roll, *id.;* and that twenty days prior to the hearing, the assessors provide notice to all property owners whose assessment has increased. *Id.* By September 1, the roll must be "completed, verified and filed", *id.* § 6, so that taxes may be computed and levied by the various tax districts based on the final assessment values.

Taxes computed from the assessment roll become "due and payable on December first of each year", when they "become a lien" on the real property. *Id.* § 13(b). The taxpayer may then make payment without penalty until January 10; thereafter, a one-time penalty of five-percent is added to the tax amount, and interest begins to run on both the tax and the penalty at the rate of one-percent per month, *id.* §§ 13 to 13–c, until either the full amount is paid or the land is sold by tax sale. *See id.* §§ 40–75.

Thus, in any given tax year, the formal process for taxation of real property in the county begins on June 1, the tax status date, continues through December 1, when the taxes become due and a lien on the property is perfected, and ends only with

the payment of taxes by the property owner.

### B. *Facts.*

The dispute in this case centers in the bankruptcies of two related debtors: Parr Meadows Racing Association ("the association"), and Ronald J. Parr ("Parr"), who, during all times relevant to this appeal, served as chairman of the board of the association. Parr filed for bankruptcy on June 12, 1979; four months later, on October 4, 1979, the association petitioned for reorganization under chapter 11. This reorganization was subsequently converted to a liquidation case under chapter 7.

The principal asset of Parr and the association, and the only asset at issue on this appeal, is the Parr Meadows Racetrack ("the racetrack"), a property located in eastern Suffolk County and valued at several million dollars. Rightful ownership of the racetrack is still the subject of some dispute, but that issue is not before us on appeal. For our purposes, it is sufficient to note (1) that taxes were not paid on the racetrack property for six of the seven tax years between 1978–79 and 1984–85, and (2) that several secured creditors, including Lincoln Savings Bank, American Home Insurance Company, National Union Fire Insurance Company, New Hampshire Insurance Company, and T. Frederick Jackson, Inc. (collectively "the secured creditors") hold valid mortgages on the property, all perfected before Parr and the association filed for relief under the bankruptcy provisions.

Leaving to another day their differences as to who owned the racetrack, trustees for both Parr and the association agreed that the property should be sold. They therefore made application to, and received permission from, the bankruptcy court to sell the property to Suffolk Meadows Corporation, free and clear of all previous mortgages and liens, for a purchase price of $750,-000 in cash, plus a note and mortgage on the property for $10,750,000. Thereafter, also with the bankruptcy court's approval, the note and mortgage were discounted and sold by the trustees for a cash sum of $7,500,000; all earlier mortgages and liens that previously encumbered the racetrack property, were transferred to the proceeds of this sale. Claims of the secured creditors exceeded the total proceeds of the sale.

Dispute then arose between the county and the secured creditors as to how the cash sum should be distributed. The county claimed a priority, maintaining that all back property taxes should be paid first, and it submitted the following amounts as overdue:

| Tax Year | Flat Tax |
|----------|-----------|
| 1978–79 | $327,321.45 |
| 1979–80 | 333,859.50 |
| 1980–81 | 369,778.50 |
| 1981–82 | 382,753.80 |
| 1982–83 | 400,262.85 |
| 1984–85 | 432,092.70 |

The county's claim relies on the annual tax liens which, absent bankruptcy, attached to the racetrack every December 1. In addition, the county asserted that it should receive priority for both penalties and interest on the unpaid amounts as provided by the tax act.

The secured creditors opposed any payment to the county, other than the first lien for the year 1978–79, which was created and perfected before June 12, 1979, when the bankruptcy proceedings commenced. As to all the other tax years, the secured creditors contended that the automatic stay prohibited the creation or perfection of any tax lien after the bankruptcy petitions were filed, so that the county stood in the shoes of an unsecured creditor, and could collect its back property taxes only after the claims of the secured creditors were fully satisfied. For both interest and penalties, the secured creditors argued, the county had no priority at all.

As an interim measure, Judge Hall ordered that $500,000 of the proceeds be deposited with the county until he could resolve this issue. Then, after argument, he held that the county possessed a priority tax lien only for the 1978–79 tax year, and that all subsequent tax liens were invalid. This was so, the bankruptcy court reasoned, because, while the 1978–79 tax lien was created and perfected before the bank-

ruptcy proceedings were commenced, the remaining tax liens could not have been created and perfected until after the protection of § 362(a) came into effect, thus rendering those claims of the county "unsecured and subordinate to the claims of the [secured creditors]."

Having found all but one of the tax liens to be void, the bankruptcy court then found it unnecessary to determine whether penalties and interest were due on the liens. Instead, it simply ordered that the county return $172,768.55 to the trustees, the difference between the 1978–79 taxes due (without penalties or interest) and the $500,000 deposited with the county.

The county appealed to the United States District Court for the Eastern District of New York, and on October 14, 1988, Judge Wexler affirmed the bankruptcy court in all respects. First, utilizing the same reasoning as the bankruptcy court, the district court held that the 1978–79 tax lien was valid and enforceable, but that the tax amounts secured by liens created and perfected after the bankruptcy petitions were filed were unsecured and would be payable only after the claims of the secured creditors were satisfied.

Second, as to postpetition interest, the district court concluded that, even on the valid lien for the 1978–79 tax year, 11 U.S.C. § 506(b) did not authorize recovery of postpetition interest. *A fortiori* the county was not entitled to any postpetition interest for any subsequent tax year.

Finally, the district court held that "[d]ebts owed to the government as a penalty * * * cannot be recovered against a bankrupt estate unless the amount owed reflects an actual pecuniary loss". Finding no such loss, the court rejected all the county's claims for penalties on the overdue amounts, including the one based on the valid lien for the 1978–79 tax year.

The county appeals.

## DISCUSSION

The county contends that the district and bankruptcy courts erred when they refused to award it a priority over the secured creditors as to (1) the postpetition liens securing the unpaid property taxes on the racetrack; (2) interest of one percent per month from the time the taxes were due; and (3) a five-percent penalty on the overdue amount for each tax year.

### A. *The Liens Securing the Postpetition Real Property Taxes.*

Both courts below held that the tax liens perfected after June 12, 1979—the date when the first bankruptcy petition was filed—were invalid because they violated the automatic stay, 11 U.S.C. § 362(a). That provision states in relevant part:

a petition filed under * * * this title * * * operates as a stay, applicable to all entities, of * * * (4) any act to create, perfect, or enforce any lien against the property of the estate.

The county launches a two-pronged attack against this determination, contending that, by its explicit terms, § 362(a)(4) does not apply in this case, and in the alternative, if the section does apply, that congress carved out an exception for local tax liens when it passed §§ 362(b)(3) and 546(b) of the bankruptcy code.

### 1. *The application of § 362(a)(4).*

The county relies on a narrow reading of the statute. Since the automatic stay prohibits only any "*act*" to create, perfect, or enforce a lien, the county argues that it falls outside the scope of this prohibition because, under the tax act, a tax lien is created and perfected "by operation of law" without any "affirmative act" by the county. In effect, the county maintains that it has not violated the automatic stay because each tax lien, without any "affirmative act" by the county, has created and perfected itself "by operation of law". We reject this argument.

At the outset, we are unpersuaded that the tax liens at issue here came into being without any "affirmative act". On the contrary, an examination of the tax act reveals several "acts" which must take place before the lien attaches. For example, the assessors must prepare a preliminary assessment roll, give notice and hear com-

plaints, complete the final assessment roll, and certify the roll to the school districts, Suffolk County Tax Act §§ 5–7; the taxing authority must compute and adopt the tax rate, *id.* § 8; the town supervisors must "extend or cause to be extended upon the assessment roll" the taxes against each taxable property and file a certificate with the county legislature, *id.* §§ 11–12; and the county legislature must annex a warrant to the assessment roll of each town. *Id.* § 13(a). Thus, the tax liens here did not come passively into being "by operation of law"; rather, they were created and perfected as a direct result of the county's assessment and taxation process, which consists of several "affirmative acts" by county, town, and school district officers, administrators, and agents. *See In re Guterl,* 95 B.R. 370, 373–75 (Bkrtcy.W.D.Pa. 1989) (in the taxation process, "acts of publication, confirmation, and adoption are acts of creation"; if these acts occurred "postpetition in violation of § 362(a)(4)", then the liens resulting from the tax process are "null and void").

■ Further, even if it were possible to create and perfect a lien without any action by the county, that lien, attaching to the property postpetition, would still violate the automatic stay. *In re Bellman Farms, Inc.,* 86 B.R. 1016, 1020 (Bkrtcy.D.S.D. 1988) (creation and perfection of postpetition liens, which became due and owing by operation of law and without affirmative act by county, nevertheless violated automatic stay); *In re Ballentine Bros., Inc.,* 86 B.R. 198, 200–01 (Bkrtcy.D.Neb.1988) (even though statute provided for creation and perfection of tax lien without any action by county, postpetition lien violated provisions of automatic stay); *In re Stack Steel & Supply Co.,* 28 B.R. 151, 155 (Bkrtcy.W.D.Wash.1983) ("any lien which is claimed by [the county] to have attached *after* the filing of the Chapter 11 petition is void") (emphasis in original); *see also H. & H. Beverage Distributors v. Department of Revenue,* 850 F.2d 165, 170 n. 6 (3d Cir.) (once automatic stay is in place, "the creation of any lien, regardless of * * * its purpose is barred by § 362"), *cert. denied,*

— U.S. ——, 109 S.Ct. 560, 102 L.Ed.2d 586 (1988); *In re Carlisle Court, Inc.,* 36 B.R. 209, 214 (Bkrtcy.D.C.1983) ("in its broad application" the automatic stay prevents any "creation of a lien").

■ The automatic stay is a crucial provision of bankruptcy law. It prevents disparate actions against debtors and protects creditors in a manner consistent with the bankruptcy goal of equal treatment, *see Hunt v. Bankers Trust Co.,* 799 F.2d 1060, 1069 (5th Cir.1986); *In re Holtkamp,* 669 F.2d 505, 508 (7th Cir.1982), by ensuring that no creditor receives more than an equitable share of the bankrupt's estate. *See In re Stringer,* 847 F.2d 549, 551 (9th Cir. 1988).

This equitable treatment requires that all creditors, both public and private, be subject to the automatic stay. *See 2 Collier on Bankruptcy* ¶ 362.04 (15th ed. 1988). Recognizing this, congress used broad language which prohibits "all entities", 11 U.S.C. § 362(a), including all "governmental unit[s]", 11 U.S.C. § 101(14), from moving against a debtor's property during the pendency of the bankruptcy proceedings. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 342, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5963, 6299; *In re Eisenberg,* 7 B.R. 683, 687 (Bkrtcy.E.D.N.Y. 1980).

It is true, as the county argues, that the prohibitions of § 362(a), when applied to the taxing arm of local government, may hinder that government—as it does other creditors—from collecting funds needed for its continuing operations, and, at least in part, from receiving full compensation for services that may benefit the debtor or the debtor's property. But it is also true that this is a necessary step if bankruptcy courts are to effectively and fairly reorganize and liquidate a bankrupt's estate. Indeed, if a bankruptcy court lacked such power, actions by local government "would pull out chunks of an estate from the reorganization court and * * * [would] seriously impair the power of the court to administer the estate". *Gardner v. New Jersey,* 329 U.S. 565, 577, 67 S.Ct. 467, 473, 91 L.Ed. 504 (1947); *see In re Morton,* 866

F.2d 561, 564 (2d Cir.1989) (state law must be suspended if it conflicts with the goals of the automatic stay).

In short, the county's first argument, that the tax liens here were created without "action" and thus did not violate the automatic stay, interprets the provisions of § 362(a) too narrowly and misconstrues congress's intent when it included local governments among the entities subject to the automatic stay. We therefore decline to adopt it.

2. *Exceptions to § 362(a).*

As an alternative position the county claims to qualify under the exception to the automatic stay that is authorized by §§ 362(b)(3) and 546(b) of the code.

Section 362(b)(3), which creates one of several statutory exceptions to the automatic stay, provides that the filing of a petition does not operate as a stay of "any act to perfect an interest in property to the extent that the trustee's rights and powers are subject to perfection under section 546(b)". Section 546(b), in turn, exempts from the trustee's power of avoidance "any generally applicable law that permits the perfection of an *interest in property* to be effective against an entity that acquires rights in such property before the date of such perfection." (emphasis added).

 Thus, simply stated, if a creditor possesses a prepetition interest in property, and state law establishes a time period for perfection of a lien based upon that interest, the "lien does not lose its preferred standing by reason of the fact that it [is] not perfected until after the commencement of bankruptcy" so long as it is perfected within the time period established by state law. *Poly Industries, Inc. v. Mozley*, 362 F.2d 453, 457 (9th Cir.), *cert. denied*, 385 U.S. 958, 87 S.Ct. 393, 17 L.Ed.2d 304 (1966). The relatively narrow purpose of this exception is to "protect, in spite of the surprise intervention of [the] bankruptcy petition, those whom State law protects" by allowing them to perfect an interest they obtained before the bankruptcy proceedings began. H.R.Rep. No. 595, 95th Cong., 1st Sess. 371, *reprinted in* 1978

U.S.Code Cong. & Admin. News 6327; S.Rep. No. 989, 95th Cong., 2d Sess. 86, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5872.

 Here, there is no dispute either that state law allows for perfection of the tax lien on December 1 of the tax year, or that the county did perfect its liens on December 1 of each year. Thus, the only real question as to whether the exception under § 546(b) applies is whether the county had an "interest in [the] property" before December 1, and if so, when that interest arose.

The secured creditors would have us hold, as did the district and bankruptcy courts, that the county has no interest in the property until the lien date, December 1, when each year taxes became due and payable. In contrast, the county would have us hold, as has our sister court of appeals for the fourth circuit, that the county's "interest in property", at least as far as taxation is concerned, is "long-standing" and "ever-present", *Maryland National Bank v. Mayor & City Council of Baltimore*, 723 F.2d 1138, 1142–43 (4th Cir. 1983), so that a new, super-priority tax lien arose each December 1 of the six tax years at issue here. We have carefully considered both of these positions, and we conclude that for the tax system in Suffolk County, neither rationale is correct.

On one hand, we are satisfied that, under New York tax law, the county did have an interest in the racetrack property before the taxes thereon actually became due and payable and the lien attached. Taxation of real property in Suffolk County does not begin with the attachment of the lien each December 1; to the contrary, the process begins seven months earlier with the tax status date, *see* N.Y. Real Prop. Tax Law § 302; Suffolk County Tax Act § 5, "as of" which all real property is "valued according to its condition". *Northville Industries v. Board of Assessors*, 143 A.D.2d 135, 136, 531 N.Y.S.2d 592, 593 (2d Dep't 1988). Except for miscalculations or other clerical mistakes, and any adjustments made during the brief review period, these

assessed values serve as the basis for all taxes in the upcoming year, regardless of any change in the status or value of some particular property at a later date. *Adirondack Mountain Reserve v. Board of Assessors*, 99 A.D.2d 600, 601, 471 N.Y.S.2d 703, 705 (3d Dep't), *aff'd in part and appeal dismissed in part*, 64 N.Y.2d 727, 475 N.E.2d 115, 485 N.Y.S.2d 744 (1984). In other words, even though the property taxes will not be levied or paid until at least six months later, and even though the value and use of the land could change dramatically before that time, the assessment of the property, which will be used to determine the tax due, is made by looking only to the value of the property on the tax status date, *see In re Addis Co.*, 79 A.D.2d 856, 857, 434 N.Y.S.2d 489, 490 (4th Dep't 1980), without any regard to possible changes in condition or ownership before the lien attaches. *See, e.g., R.P. Adams Co. v. Nist*, 97 Misc.2d 374, 411 N.Y.S.2d 504 (N.Y.Sup.Ct.1978), *rev'd on other grounds*, 72 A.D.2d 908, 422 N.Y.S.2d 184 (4th Dep't 1979); *Roosevelt Nassau Operating Corp. v. Board of Assessors*, 68 Misc.2d 183, 326 N.Y.S.2d 628 (N.Y.Sup.Ct. 1970), *aff'd*, 41 A.D.2d 647, 340 N.Y.S.2d 871 (2d Dep't 1973).

Of course, after the tax status date other acts are required before the amount of the tax is determined and the lien securing that tax attaches to any particular piece of property. But these acts are merely further steps towards the completion of the taxation process and the perfection of the county's interest in the property—an interest which arose on the tax status date when the county determined that the property was taxable, and when it fixed the value of the property for that tax year. *See Northville*, 531 N.Y.S.2d at 595; *Adirondack*, 471 N.Y.S.2d at 705; *see also Maryland National Bank*, 723 F.2d at 1143 (attachment of the lien "is only the last—not the first—step required to perfect" an interest in real property).

On the other hand, we are also unpersuaded by the fourth circuit's view that the county has an interest in the property that is "ever-present" because of its inherent governmental authority and control over the land. *Maryland National Bank*, 723 F.2d at 1142. Statutory exceptions to the automatic stay are to be interpreted narrowly and in accordance with its underlying rationale. *In re Stringer*, 847 F.2d 549, 552 (9th Cir.1988). That rationale—that all creditors of a bankrupt estate, including local governments, receive fair and equal treatment—would be effectively destroyed if, for every year of the bankruptcy proceeding, the county were granted priority over all secured creditors and allowed to collect on its tax liens as they attach. *See In re Guterl Special Steel Corp.*, 95 B.R. 370 (Bkrtcy.W.D.Pa.1989).

Moreover, even interpreting the exception liberally, we question whether 546(b) was ever intended to apply repeatedly during a prolonged bankruptcy. Section 546(b) was enacted to aid the creditor who, "surprise[d] [by the] intervention of [the] bankruptcy petition", is prohibited by the automatic stay from perfecting its interest in the debtor's property, but who otherwise would still be permitted to perfect that interest under state law. H.R.Rep. No. 595, 95th Cong., 1st Sess. 371, *reprinted in* 1978 U.S.Code Cong. & Admin. News 6327. The section was "not designed to give the States an opportunity to enact disguised priorities in the form of liens that apply only in bankruptcy cases." *Id.*

Yet that is exactly what the county would have us do here. Instead of interpreting § 546(b) as a one-time exception for the creditor who gave value but has not yet perfected its lien, the county would have us create a rotating exception, which, every December 1, would add another lien at the front of the priority line, enabling the county to effectively collect on all its claims as if no bankruptcy petition had ever been filed. Such an interpretation would effectively remove the taxing arms of local government from the controlling provisions of the bankruptcy code, a result clearly contrary to the intent of congress. *See* 11 U.S.C. § 101(14); H.R.Rep. No. 595, 95th Cong., 1st Sess. 342, *reprinted in* 1978 U.S.Code Cong. & Admin. News 6299; *see also Gardner v. New Jersey*, 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947).

With these considerations in mind, and after examining the provisions of the tax act, we hold that the county obtains an "interest in [the] property" sufficient to fall under § 546(b) on June 1, the tax status date. All assessment of property occurs as of that date, and from that time forward, the county has a real and identifiable interest in the property which cannot be erased or altered by subsequent events. *See, e.g., Rochester Housing Authority v. Sibley Corp.*, 77 Misc.2d 205, 351 N.Y.S.2d 934 (N.Y.Sup.Ct.1974) (if property is non-exempt on tax status date it remains non-exempt for tax year even if exempt organization acquires the property before the tax lien attaches), *aff'd*, 47 A.D.2d 718, 367 N.Y.S.2d 969 (4th Dep't 1975); *R.P. Adams Co.*, 411 N.Y.S.2d at 506 (same); *Roosevelt*, 326 N.Y.S.2d at 631–32 (portion of improvement to property which was not completed on tax status date could not be included in assessment for that tax year).

Moreover, practical necessity required that there be some key date for determining the assessed values, and in New York state, including Suffolk County, that date is the "tax status date". All tax districts in the county must calculate their annual tax rates based on the assessment roll. They must divide the total assessed valuation into the budget amount to be raised by taxes, and the quotient is the tax rate for the following year. Thus, the tax burden for every taxpayer would be affected by any changes in assessed valuations.

Some no doubt will contend that our holding conflicts with the fourth circuit's determination in *Maryland National Bank*. While facially our analyses may differ, we think a full reading of the record in both cases shows our holdings to be reconcilable even if not congruent. First, both cases depend heavily on state tax law, which differs significantly between New York and Maryland. While the tax act in Maryland gave the fourth circuit significant indication that local government possessed a "long-standing" interest in the property, *see* 723 F.2d at 1142–43, the tax act at issue here makes absolutely no suggestion that the county's interest accrues any earlier than the tax status date. Sec-

ond, stripped to its bare holding, *Maryland National* held only that a bankruptcy petition filed on October 31, 1979, only two months before the "date of finality" under local tax law (presumably the date when the assessment roll becomes final), did not render invalid a tax lien perfected some six months later on July 1, 1980, because the local taxing entity had possessed an "interest in [the] property" before the petition was filed. That is similar to our holding here: The bankruptcy petition, filed on June 12, 1979, nearly two weeks after the tax status date and more than two months before September 1 when the assessment roll becomes "final", does not render invalid a tax lien perfected months later on December 1, 1979, because the taxing entity possessed an "interest in [the] property" before the petition was filed.

■ Applying this rule to the facts in this case, we conclude that the county holds valid tax liens for the first two tax years at issue. For the 1978–79 tax year, the county completed the entire taxation process before the bankruptcy petitions were filed, and the district and bankruptcy courts were therefore correct when they found a valid tax lien for that year in the amount of $327,231.45.

In addition, and contrary to the holdings in the district and bankruptcy courts, the lien for the 1979–80 tax year is also valid, this time under the provisions of § 546(b). The county acquired an "interest in property" on June 1, 1979, the tax status date, twelve days before the first petition in bankruptcy was filed. As provided by state law, the lien securing the taxes levied in reliance upon that interest was perfected on December 1, 1979, and continues in effect today.

However, as to all remaining liens, because the county did not possess, prior to the filing of the bankruptcy petition, a sufficient "interest in property" to qualify for the § 546(b) exception, we must conclude that creation and perfection of each of these later liens violated the automatic stay. Hence, each of these remaining liens is void, and the county stands in the shoes

of an unsecured creditor as to the amount due for each of those tax years.

### B. Postpetition Interest on Valid Tax Liens.

■ We next consider whether, under 11 U.S.C. § 506(b), the county was entitled to a priority on the interest on its valid tax liens. That section states:

To the extent that an allowed secured claim is secured by property the value of which * * * is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

In light of this language, the district court held that the county was not entitled to any interest on its valid tax liens, because the interest provision was not "provided for under [an] agreement", as required by § 506(b), but was instead mandated by the tax act.

Recently, however, the Supreme Court, interpreting the language and punctuation of § 506(b), has held that the section "entitles the holder of an oversecured claim to postpetition interest and, in addition, gives one having a secured claim created pursuant to an agreement the right to reasonable fees, costs, and charges provided for in that agreement. Recovery of postpetition interest is unqualified." *United States v. Ron Pair Enterprises, Inc.*, —— U.S. ——, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989).

*Ron Pair* directly controls in this case, insofar as the county possesses *valid* oversecured liens on the racetrack. As we determined above, the county possesses two such liens: one for the 1978–79 taxes and one for the 1979–80 taxes. Accordingly, we reverse that part of the judgment of the district court that relates to postpetition interest on these two liens, and remand to the district court for a calculation of interest.

### C. Penalties on the Valid Tax Liens.

■ *Ron Pair* also answers the question whether, under § 506(b), the county is entitled to priority on its penalty claims. Under the bankruptcy code, "[r]ecovery of fees, costs, and charges" is allowed "only if they are reasonable and provided for in the agreement under which the claim arose." In the absence of such an agreement, fees and costs are not recoverable. *Ron Pair*, 109 S.Ct. at 1030.

Here, the claims for penalties arose, not under an agreement between the parties, but by operation of law under the tax act. Consequently, the district court was correct when it held that § 506(b) did not apply to penalties, and that the secured creditors had priority over the county's penalty claims.

We note that because the priority provisions of § 506(b) are inapplicable, and because the district court found that the penalties did not represent any pecuniary loss to the county—a finding which is not clearly erroneous on the record before us—11 U.S.C. § 726(a)(4) determines in what order the county's penalty claims should be satisfied in relation to other creditors. Thus, if any money remains after the secured creditors' and other, higher priority claims are satisfied, the county can recover its penalty claims from the estate.

### CONCLUSION

The county possesses valid tax liens, entitling them to priority over the secured creditors, for the 1978–79 and 1979–80 tax years. The county is also entitled to a priority for postpetition interest, determined under the tax act, on these two claims, but not for any penalties.

As to the claims based on tax years after 1979–80, the county's tax liens are invalid. Therefore, as to these amounts, priority goes to the secured creditors.

Affirmed in part, reversed in part, and remanded.